# TABLE OF AUTHORITIES

1. *Cummings v. Premier Rehab Keller*, P.L.C., 142 S.Ct. 1562 (2022)

2. *Bonnewitz v. Baylor University,* 6:21-CV-00491. 2-22 U.S. Dist. LEXIS 122572 (W.D. Tex. July 12, 2022)

3. *Fantasia v. Montefiore New Rochelle*, 19 CV 11054 (VB) (S.D. New York June 16, 2022)

4. *Doe v. Purdue University*, Cause No. 4-18-CV-89 (N.D. Indiana, Lafayette Division, July 20, 2022)

# AUTHORITY 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.*, 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CUMMINGS *v.* PREMIER REHAB KELLER, P.L.L.C.

### ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 20–219.   Argued November 30, 2021—Decided April 28, 2022

Jane Cummings, who is deaf and legally blind, sought physical therapy services from Premier Rehab Keller and asked Premier Rehab to provide an American Sign Language interpreter at her sessions. Premier Rehab declined to do so, telling Cummings that the therapist could communicate with her through other means. Cummings later filed a lawsuit seeking damages and other relief against Premier Rehab, alleging that its failure to provide an ASL interpreter constituted discrimination on the basis of disability in violation of the Rehabilitation Act of 1973 and the Affordable Care Act. Premier Rehab is subject to these statutes, which apply to entities that receive federal financial assistance, because it receives reimbursement through Medicare and Medicaid for the provision of some of its services. The District Court determined that the only compensable injuries allegedly caused by Premier Rehab were emotional in nature. It held that damages for emotional harm are not recoverable in private actions brought to enforce either statute. The District Court thus dismissed the complaint, and the Fifth Circuit affirmed.

*Held:* Emotional distress damages are not recoverable in a private action to enforce either the Rehabilitation Act of 1973 or the Affordable Care Act. Pp. 3–15.

  (a) Congress has broad power under the Spending Clause of the Constitution to "fix the terms on which it shall disburse federal money." *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 17. Pursuant to that authority, Congress has enacted statutes prohibiting recipients of federal financial assistance from discriminating on the basis of certain protected characteristics. This Court has held that such statutes may be enforced through implied rights of action. *Barnes* v. *Gorman*, 536 U. S. 181, 185. Although it is "beyond dispute that

2                      CUMMINGS *v.* PREMIER REHAB KELLER

Syllabus

private individuals may sue" to enforce the antidiscrimination statutes at issue here, "it is less clear what remedies are available in such a suit." *Ibid.*

The Court's cases have clarified that whether a particular remedy is recoverable must be informed by the way Spending Clause "statutes operate": by "conditioning an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds." *Gebser* v. *Lago Vista Independent School Dist.*, 524 U. S. 274, 286. Because Spending Clause legislation operates based on consent, the "legitimacy of Congress' power" to enact such laws rests not on its sovereign authority, but on "whether the [recipient] voluntarily and knowingly accepts the terms of th[at] 'contract.'" *Barnes*, 536 U. S., at 186 (quoting *Pennhurst*, 451 U. S., at 17). The Court has regularly applied this contract-law analogy to define the scope of conduct for which funding recipients may be held liable, with an eye toward ensuring that recipients had notice of their obligations. "The same analogy," *Barnes*, 536 U. S., at 187, similarly limits "the scope of available remedies." *Gebser*, 524 U. S., at 287. Thus, a particular remedy is available in a private Spending Clause action "only if the funding recipient is *on notice* that, by accepting federal funding, it exposes itself to liability of that nature." *Barnes*, 536 U. S., at 187. Pp. 3–5.

(b) To decide whether emotional distress damages are available under the Spending Clause statutes in this case, the Court therefore asks whether a prospective funding recipient deciding whether to accept federal funds would have had "clear notice" regarding that liability. *Arlington Central School Dist. Bd. of Ed.* v. *Murphy*, 548 U. S. 291, 296. Because the statutes at issue are silent as to available remedies, it is not obvious how to decide that question. Confronted with the same dynamic in *Barnes*, which involved the question whether punitive damages are available under the same statutes, the Court followed the contract analogy and concluded that a federal funding recipient may be considered "on notice that it is subject . . . to those remedies traditionally available in suits for breach of contract." 536 U. S., at 187. Given that punitive damages "are generally not available for breach of contract," the Court concluded that funding recipients "have not, merely by accepting funds, implicitly consented to liability for punitive damages." *Id.*, at 187–188.

Crucial here, the Court in *Barnes* considered punitive damages generally unavailable for breach of contract despite the fact that such damages are hardly unheard of in contract cases: Treatises cited in *Barnes* described punitive damages as recoverable in contract where "the conduct constituting the breach is also a tort for which punitive damages are recoverable." Restatement (Second) of Contracts §355, p.

Syllabus

154. That recognized exception to the general rule, however, was not enough to give funding recipients the requisite notice that they could face such damages. Under *Barnes*, the Court thus presumes that recipients are aware that they may face the *usual* contract remedies in private suits brought to enforce their Spending Clause "contract" with the Federal Government. Pp. 5–7.

(c) The above framework produces a straightforward analysis in this case. Hornbook law states that emotional distress is generally not compensable in contract. Under *Barnes*, the Court cannot treat federal funding recipients as having consented to be subject to damages for emotional distress, and such damages are accordingly not recoverable.

Cummings argues for a different result, maintaining that traditional contract remedies here *do* include damages for emotional distress, because there is an exception—put forth in some contract treatises—under which such damages may be awarded where a contractual breach is particularly likely to result in emotional disturbance. See, *e.g.*, Restatement (Second) of Contracts §353. That special rule is met here, Cummings contends, because discrimination is very likely to engender mental anguish. This approach would treat funding recipients as on notice that they will face not only the general rules, but also "more fine-grained," exceptional rules that "govern[ ] in the specific context" at hand. Brief for Petitioner 33–35. That is inconsistent with both *Barnes* and the Court's larger Spending Clause jurisprudence. *Barnes* necessarily concluded that the existence of an on-point exception to the general rule against punitive damages was insufficient to put funding recipients on notice of their exposure to that particular remedy. No adequate explanation has been offered for why the Court—bound by *Barnes*—should reach a different result here. The approach offered by Cummings pushes the notion of offer and acceptance, central to the Court's Spending Clause cases, past its breaking point. It is one thing to say that funding recipients will know the basic, general rules. It is quite another to assume that they will know the contours of every contract doctrine, no matter how idiosyncratic or exceptional. Cummings would essentially incorporate the law of contract remedies wholesale, but *Barnes* constrains courts to imply only those remedies "that [are] normally available for contract actions." *Id.*, at 188. In urging the Court to disregard that restriction, Cummings would have the Court treat statutory silence as a license to freely supply remedies the Court cannot be sure Congress would have chosen. Such an approach "risks arrogating legislative power," *Hernández* v. *Mesa*, 589 U. S. ___, ___, and is particularly untenable in a context requiring "clear notice regarding the liability at issue," *Arlington*, 548 U. S., at 296.

Even if it were appropriate to treat funding recipients as aware that

4                CUMMINGS v. PREMIER REHAB KELLER

Syllabus

they may be subject to "rare" contract-law rules that are "satisfied only in particular settings," Brief for Petitioner 34, funding recipients would still lack the requisite notice that emotional distress damages are available under the statutes at issue. That is because the Restatement's formulation—that such damages are available where "the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result," §353—does not reflect the consensus rule among American jurisdictions. There is in fact no majority rule on what circumstances, if any, may trigger the exceptional allowance of such damages. For instance, many states reject the broad and generally phrased Restatement exception because they award emotional distress damages only in a narrow and idiosyncratic group of cases in which the breaching conduct would also have been a tort. These cases unsurprisingly mix contract, quasi-contract, and tort principles together, suggesting that they do not establish or evince a rule of *contract* law.

Emotional distress damages are not "traditionally available in suits for breach of contract." *Barnes*, 536 U. S., at 187. There is correspondingly no ground, under the Court's cases, to conclude that federal funding recipients have "clear notice," *Arlington*, 548 U. S., at 296, that they would face such a remedy in private actions brought to enforce the statutes here. Pp. 7–15.

948 F. 3d 673, affirmed.

ROBERTS, C. J., delivered the opinion of the Court, in which THOMAS, ALITO, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined. KAVANAUGH, J., filed a concurring opinion, in which GORSUCH, J., joined. BREYER, J., filed a dissenting opinion, in which SOTOMAYOR and KAGAN, JJ., joined.

1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

___

No. 20–219

___

## JANE CUMMINGS, PETITIONER v. PREMIER REHAB KELLER, P.L.L.C.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[April 28, 2022]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

Congress has broad power under the Spending Clause of the Constitution to set the terms on which it disburses federal funds. "[L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the [recipients] agree to comply with federally imposed conditions." *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 17 (1981). Exercising this authority, Congress has passed a number of statutes prohibiting recipients of federal financial assistance from discriminating based on certain protected characteristics. We have held that these statutes may be enforced through implied rights of action, and that private plaintiffs may secure injunctive or monetary relief in such suits. See *Barnes* v. *Gorman*, 536 U. S. 181, 185, 187 (2002). Punitive damages, on the other hand, are not available. *Id.,* at 189. The question presented in this case is whether another special form of damages—damages for emotional distress—may be recovered.

Opinion of the Court

I

Petitioner Jane Cummings is deaf and legally blind, and communicates primarily in American Sign Language (ASL). In October 2016, she sought physical therapy services from respondent Premier Rehab Keller, a small business in the Dallas-Fort Worth area. Cummings requested that Premier Rehab provide an ASL interpreter at her appointments. Premier Rehab declined to do so, telling Cummings that she could communicate with the therapist using written notes, lip reading, or gesturing. Cummings then sought and obtained care from another provider.

Cummings later filed this lawsuit against Premier Rehab, alleging that its failure to provide an ASL interpreter constituted discrimination on the basis of disability in violation of the Rehabilitation Act of 1973, §504, 87 Stat. 394, as amended, 29 U. S. C. §794(a), and the Patient Protection and Affordable Care Act, §1557, 124 Stat. 260, 42 U. S. C. §18116. Premier Rehab is subject to these statutes, which apply to entities that receive federal financial assistance, because it receives reimbursement through Medicare and Medicaid for the provision of some of its services. In her complaint, Cummings sought declaratory relief, an injunction, and damages.

The District Court dismissed the complaint. It observed that "the only compensable injuries that Cummings alleged Premier caused were 'humiliation, frustration, and emotional distress.'" No. 4:18–CV–649–A (ND Tex., Jan. 16, 2019), 2019 WL 227411, *4. In the District Court's view, "damages for emotional harm" are not recoverable in private actions brought to enforce the Rehabilitation Act or the Affordable Care Act. *Ibid.* The Court of Appeals for the Fifth Circuit affirmed, adopting the same conclusion. 948 F. 3d 673 (2020).

We granted certiorari. 594 U. S. ___ (2021).

Cite as: 596 U. S. ____ (2022)

3

Opinion of the Court

II

A

Pursuant to its authority to "fix the terms on which it shall disburse federal money," *Pennhurst*, 451 U. S., at 17, Congress has enacted four statutes prohibiting recipients of federal financial assistance from discriminating based on certain protected grounds. Title VI of the Civil Rights Act of 1964 forbids race, color, and national origin discrimination in federally funded programs or activities. 78 Stat. 252, 42 U. S. C. §2000d. Title IX of the Education Amendments of 1972 similarly prohibits sex-based discrimination, 86 Stat. 373, 20 U. S. C. §1681, while the Rehabilitation Act bars funding recipients from discriminating because of disability. 29 U. S. C. §794. Finally, the Affordable Care Act outlaws discrimination on any of the preceding grounds, in addition to age, by healthcare entities receiving federal funds. 42 U. S. C. §18116.

None of these statutes expressly provides victims of discrimination a private right of action to sue the funding recipient in federal court. But as to both Title VI and Title IX, our decision in *Cannon* v. *University of Chicago*, 441 U. S. 677, 703 (1979), "found an *implied* right of action." *Barnes*, 536 U. S., at 185. Congress later "acknowledged this right in amendments" to both statutes, *ibid.*, leading us to conclude that it had "ratified *Cannon*'s holding" that "private individuals may sue to enforce" both statutes. *Alexander* v. *Sandoval*, 532 U. S. 275, 280 (2001); see also *Franklin* v. *Gwinnett County Public Schools*, 503 U. S. 60, 72–73 (1992). As to the Rehabilitation Act and the Affordable Care Act—the two statutes directly at issue in this litigation—each expressly incorporates the rights and remedies provided under Title VI. 29 U. S. C. §794a(a)(2); 42 U. S. C. §18116(a).

Although it is "beyond dispute that private individuals may sue to enforce" the antidiscrimination statutes we consider here, "it is less clear what remedies are available in

Opinion of the Court

such a suit." *Barnes*, 536 U. S., at 185.  In *Franklin*, we considered whether monetary damages are available as a remedy for intentional violations of Title IX (and, by extension, the other statutes we discussed).  503 U. S., at 76.  We answered yes, *ibid.*, but "did not describe the scope of 'appropriate relief.'"  *Barnes*, 536 U. S., at 185.

Our later cases have filled in that gap, clarifying that our consideration of whether a remedy qualifies as appropriate relief must be informed by the way Spending Clause "statutes operate": by "conditioning an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds."  *Gebser* v. *Lago Vista Independent School Dist.*, 524 U. S. 274, 286 (1998).  Unlike ordinary legislation, which "imposes congressional policy" on regulated parties "involuntarily," Spending Clause legislation operates based on consent: "in return for federal funds, the [recipients] agree to comply with federally imposed conditions."  *Pennhurst*, 451 U. S., at 16, 17.  For that reason, the "legitimacy of Congress' power" to enact Spending Clause legislation rests not on its sovereign authority to enact binding laws, but on "whether the [recipient] voluntarily and knowingly accepts the terms of th[at] 'contract.'"  *Barnes*, 536 U. S., at 186 (quoting *Pennhurst*, 451 U. S., at 17).

"We have regularly applied th[is] contract-law analogy in cases defining the scope of conduct for which funding recipients may be held liable for money damages."  *Barnes*, 536 U. S., at 186.  Recipients cannot "knowingly accept" the deal with the Federal Government unless they "would clearly understand . . . the obligations" that would come along with doing so.  *Arlington Central School Dist. Bd. of Ed.* v. *Murphy*, 548 U. S. 291, 296 (2006).  We therefore construe the reach of Spending Clause conditions with an eye toward "ensuring that the receiving entity of federal funds [had]

notice that it will be liable." *Gebser*, 524 U. S., at 287 (internal quotation marks omitted). "Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst*, 451 U. S., at 17.

"The same analogy," *Barnes*, 536 U. S., at 187, similarly limits "the scope of available remedies" in actions brought to enforce Spending Clause statutes, *Gebser*, 524 U. S., at 287. After all, when considering whether to accept federal funds, a prospective recipient would surely wonder not only what rules it must follow, but also what sort of penalties might be on the table. See *Barnes*, 536 U. S., at 188. A particular remedy is thus "appropriate relief" in a private Spending Clause action "only if the funding recipient is *on notice* that, by accepting federal funding, it exposes itself to liability of that nature." *Id.,* at 187 (emphasis in original). Only then can we be confident that the recipient "exercise[d its] choice knowingly, cognizant of the consequences of [its] participation" in the federal program. *Pennhurst*, 451 U. S., at 17.

B

In order to decide whether emotional distress damages are available under the Spending Clause statutes we consider here, we therefore ask a simple question: Would a prospective funding recipient, at the time it "engaged in the process of deciding whether [to] accept" federal dollars, have been aware that it would face such liability? *Arlington*, 548 U. S., at 296. If yes, then emotional distress damages are available; if no, they are not.

Because the statutes at issue are silent as to available remedies, it is not obvious how to decide whether funding recipients would have had the requisite "clear notice regarding the liability at issue in this case." *Ibid*. We confronted that same dynamic in *Barnes*. There, we considered whether a federal funding recipient would have known,

when taking the money, that it was agreeing to face puni-
tive damages in suits brought under those laws. We noted
that the statutory text "contains no express remedies." 536
U. S., at 187. But we explained that, following the contract
analogy set out in our Spending Clause cases, a federal
funding recipient may be considered "on notice that it is
subject not only to those remedies explicitly provided in the
relevant legislation, but also to those remedies traditionally
available in suits for breach of contract." *Ibid.* We identi-
fied two such remedies: compensatory damages and injunc-
tions. By contrast, we explained, punitive damages "are
generally not available for breach of contract." *Ibid.* We
thus concluded that funding recipients covered by the stat-
utes at issue "have not, merely by accepting funds, implic-
itly consented to liability for punitive damages." *Id.,* at 188.

Crucial for this case, we considered punitive damages to
be "generally not available for breach of contract," see *id.,*
at 187, despite the fact that such damages are hardly un-
heard of in contract cases. Indeed, according to the trea-
tises we cited, punitive damages are recoverable in contract
where "the conduct constituting the breach is also a tort for
which punitive damages are recoverable." Restatement
(Second) of Contracts §355, p. 154 (1979); see also 3 E.
Farnsworth, Contracts §12.8, pp. 192–201 (2d ed. 1998).
That recognized exception to the general rule, however, was
not enough to give funding recipients the requisite notice
that they could face such damages.

Under *Barnes,* then, we may presume that a funding re-
cipient is aware that, for breaching its Spending Clause
"contract" with the Federal Government, it will be subject
to the *usual* contract remedies in private suits. That is ap-
parent from the adverbs *Barnes* repeatedly used, requiring
that a remedy be "traditionally available," "generally . . .
available," or "normally available for contract actions." 536
U. S., at 187–188. And it is confirmed by the Court's hold-

Opinion of the Court

ing: that punitive damages are unavailable in private actions brought under these statutes even though such damages are a familiar feature of contract law.

## C

Under the framework just set out, the analysis here is straightforward. It is hornbook law that "emotional distress is generally not compensable in contract," D. Laycock & R. Hasen, Modern American Remedies 216 (5th ed. 2019), just as "punitive damages . . . are generally not available for breach of contract," *Barnes*, 536 U. S., at 187. See 11 W. Jaeger, Williston on Contracts §1341, p. 214 (3d ed. 1968) ("Mental suffering caused by breach of contract, although it may be a real injury, is not generally allowed as a basis for compensation in contractual actions." (footnote omitted)); E. Farnsworth, Contracts §12.17, p. 894 (1982) (describing rule of "generally denying recovery for emotional disturbance, or 'mental distress,' resulting from breach of contract" as "firmly rooted in tradition"); J. Perillo, Calamari & Perillo on Contracts §14.5, p. 495 (6th ed. 2009) (Calamari & Perillo) ("As a general rule, no damages will be awarded for the mental distress or emotional trauma that may be caused by a breach of contract."); C. McCormick, Law of Damages §145, p. 592 (1935) (McCormick) ("It is often stated as the 'general rule' that, in actions for breach of contract, damages for mental suffering are not allowable."). Under *Barnes*, we therefore cannot treat federal funding recipients as having consented to be subject to damages for emotional distress. It follows that such damages are not recoverable under the Spending Clause statutes we consider here.

In arguing for a different result, Cummings recognizes that "contract law dictates 'the *scope* of damages remedies.'" Brief for Petitioner 30. And she quotes the test set out in *Barnes*: whether a certain remedy is "traditionally

Opinion of the Court

available in suits for breach of contract." Brief for Petitioner 31. But Cummings then argues that, notwithstanding the above authorities, "traditional contract remedies" in fact *do* "include damages for emotional distress." *Ibid.*; see Brief for United States as *Amicus Curiae* 14–20 (making the same argument); *post,* at 7–9 (BREYER, J., dissenting) (same).

That is because, Cummings explains, several contract treatises put forth the special rule that "recovery for emotional disturbance" is allowed in a particular circumstance: where "the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result." Brief for Petitioner 31 (quoting Restatement (Second) of Contracts §353). And, she contends, such a rule "aptly describe[s the] intentional breach of [a] promise to refrain from discrimination," because discrimination frequently engenders mental anguish. Brief for Petitioner 31. This argument suffers from two independently fatal flaws.

*First,* Cummings subtly but crucially transforms the contract-law analogy into a test that is inconsistent with both *Barnes* and our larger Spending Clause jurisprudence. *Barnes,* recall, instructs us to inquire whether a remedy is "traditionally," "generally," or "normally available for contract actions." 536 U. S., at 187–188. Cummings, however, would look not only to those general rules, but also to whether there is a "more fine-grained" or "more directly applicable" rule of contract remedies that, although not generally or normally applicable, "govern[s] in the specific context" or "particular setting[]" of the pertinent Spending Clause provision. Brief for Petitioner 33–35; see also *post,* at 9. In other words, Cummings would treat funding recipients as on notice that they will face not only the *usual* remedies available in contract actions, but also other *unusual,* even "rare" remedies, Brief for Petitioner 34, if those remedies would be recoverable "in suits for breaches of the type of contractual commitments at issue," *id.,* at 35.

Neither petitioner nor the United States attempts to ground this approach in *Barnes*, which, as discussed above, undertook nothing of the sort. Indeed, had *Barnes* analyzed the question as petitioner frames it, the decision would have come out the opposite way. As noted, although the general rule is that punitive damages are not available in contract, they *are* undoubtedly recoverable in cases where the breaching conduct is also "a tort for which punitive damages are recoverable." Restatement (Second) of Contracts §355. Such conduct would presumably include "breaches of the type of contractual commitments at issue here," Brief for Petitioner 35–namely, the commitment not to discriminate. After all, intentional discrimination is frequently a wanton, reprehensible tort. *Barnes* itself involved "tortious conduct," 536 U. S., at 192 (Stevens, J., concurring in judgment), that the jury had found deplorable enough to warrant $1.2 million in punitive damages, *id.,* at 184 (opinion of the Court). Yet *Barnes* necessarily concluded that the existence of this on-point exception to the general rule against punitive damages was insufficient to put funding recipients on notice of their exposure to that particular remedy.

Compare in this regard the Restatement's discussion of emotional distress damages with its discussion of punitive damages:

> "**Loss Due to Emotional Disturbance**
> "Recovery for emotional disturbance will be excluded *unless* . . . the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result." §353 (emphasis added).

> "**Punitive Damages**
> "Punitive damages are not recoverable for a breach of contract *unless* the conduct constituting the breach is also a tort for which punitive damages are recoverable."

§355 (emphasis added).

It did not matter to the Court in *Barnes* that the second clause of section 355 "aptly describe[s] a funding recipient's intentional breach of its promise to refrain from discrimination." Brief for Petitioner 31. *Barnes* did not even engage in such an inquiry; it simply stopped at the word "unless." See 536 U. S., at 187–188. Neither Cummings nor the United States adequately explains why we—bound by *Barnes*—should do anything different here. Indeed, reflected in the Restatement's similar treatment of emotional distress and punitive damages is the fact that "the line between these two kinds of damages is indistinct and hard to draw." 11 J. Perillo, Corbin on Contracts §59.1, p. 546 (rev. 11th ed. 2005) (Corbin); see also D. Dobbs, Law of Remedies §12.4, p. 819 (1973) (Dobbs).

Beyond *Barnes* itself, petitioner's "more fine-grained" approach, Brief for Petitioner 33, cannot be squared with our contract analogy case law in general. As Cummings sees things, "it makes no difference whether the governing contract rule here is an 'exception,'" *id.*, at 34, because "the governing rule is just that: the governing rule," *id.*, at 35; see also *post*, at 9. But our cases do not treat suits under Spending Clause legislation as literal "suits in contract," *Sossamon* v. *Texas*, 563 U. S. 277, 290 (2011), subjecting funding recipients to whatever "governing rules" some general federal law of contracts would supply.

Rather, as set out above, we employ the contract analogy "only as a potential *limitation* on liability" compared to that which "would exist under nonspending statutes." *Ibid.* We do so to ensure that funding recipients "exercise[d] their choice" to take federal dollars "knowingly, cognizant of the consequences of" doing so. *Pennhurst*, 451 U. S., at 17. Here, the statutes at issue say nothing about what those consequences will be. Nonetheless, consistent with *Barnes*, it is fair to consider recipients aware that, if they violate

Opinion of the Court

their promise to the Government, they will be subject to either damages or a court order to perform. Those are the usual forms of relief for breaching a legally enforceable commitment. No dive through the treatises, 50-state survey, or speculative drawing of analogies is required to anticipate their availability.

The approach offered by Cummings, by contrast, pushes the notion of "offer and acceptance," *Barnes*, 536 U. S., at 186, past its breaking point. It is one thing to say that funding recipients will know the basic, general rules. It is quite another to assume that they will know the contours of every contract doctrine, no matter how idiosyncratic or exceptional. Yet that is the sort of "clear notice" that Cummings necessarily suggests funding recipients would have regarding the availability of emotional distress damages when "engaged in the process of deciding whether" to accept federal funds. *Arlington*, 548 U. S., at 296. Such a diluted conception of knowledge has no place in our Spending Clause jurisprudence.

What is more, by essentially incorporating the law of contract remedies wholesale, Cummings's rendition of the analogy "risks arrogating legislative power." *Hernández* v. *Mesa*, 589 U. S. ___, ___ (2020) (slip op., at 5). Recall that *Barnes* authorized the recovery of "remedies traditionally available in suits for breach of contract" under Spending Clause statutes, like those we consider here, that "mention[ ] no remedies." 536 U. S., at 187. *Barnes* thus permitted federal courts to do something we are usually loath to do: "find[ ] that a [certain] remedy is implied by a provision that makes no reference to that remedy," *Hernández*, 589 U. S., at ___ (slip op., at 5). But *Barnes* also placed a clear limit on that authority, constraining courts to imply only those remedies "that [are] normally available for contract actions." 536 U. S., at 188. In urging us to disregard that restriction, Cummings would have us treat statutory silence as a license to freely supply remedies we cannot be

sure Congress would have chosen to make available. That would be an untenable result in any context, let alone one in which our cases require "clear notice regarding the liability at issue," *Arlington*, 548 U. S., at 296.

*Second*, even if it were appropriate to treat funding recipients as aware that they may be subject to "rare" contract-law rules that are "satisfied only in particular settings," Brief for Petitioner 34, funding recipients would still lack the requisite notice that emotional distress damages are available under the statutes at issue. That is because the Restatement's formulation—that such damages are available where "the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result," see Restatement (Second) of Contracts §353—does not reflect the consensus rule among American jurisdictions.

Far from it. As one commentator concluded after "[s]urveying all of the cases dealing with emotional distress recovery in contract actions" over a decade after the Restatement's publication, "a majority rule does not exist" on the question. D. Whaley, Paying for the Agony: The Recovery of Emotional Distress Damages in Contract Actions, 26 Suffolk U. L. Rev. 935, 946 (1992); see also J. Chmiel, Damages—Recovery for Mental Suffering From Breach of Contract, 32 Notre Dame Law. 482 (1957) (noting "little uniformity in the decided cases"); Corbin §59.1, at 538, 540 ("Claims for damages for mental pain and suffering have caused much conflict and difference of opinion," and "the law cannot be said to be entirely settled"); Dobbs §12.4, at 819–820 (although a "group of cases have tried to formulate a broader doctrine" akin to the Restatement view, "th[e] principle is a broad and relatively undefined one," and "it is not clear how far [it] is or will be accepted by the courts"). The contrary view of the dissent, see *post*, at 4–7, is more aspirational than descriptive.

To be sure, a number of States follow the Restatement

Opinion of the Court

rule and award emotional distress damages "where the injury entails more than a pecuniary loss, and the duty violated is closely associated with the feelings and emotions of the injured party." Chmiel, 32 Notre Dame Law., at 482. That represents "the most liberal approach," Whaley, 26 Suffolk L. Rev., at 943, taken by a "strong minority" of courts, Corbin §59.1, at 541; see also McCormick §145, at 594–595. On the opposite end of the spectrum, however, several States squarely reject the Restatement, and altogether forbid recovery of emotional distress damages even where the contract relates to nonpecuniary matters. See, e.g., Tompkins v. Eckerd, Civ. No. 09–2369, 2012 WL 1110069, *4 (D SC, Apr. 3, 2012); Contreraz v. Michelotti-Sawyers, 271 Mont. 300, 309, 896 P. 2d 1118, 1123 (1995); Keltner v. Washington County, 310 Ore. 499, 504–510, 800 P. 2d 752, 754–758 (1990).

Most States reject the Restatement exception in a more nuanced way: by limiting the award of emotional distress damages to a narrow and idiosyncratic group of cases, rather than making them available in general wherever a breach would have been likely to inflict emotional harm. Calamari & Perillo §14.5, at 495–496. A good example is New York, which refused to apply the Restatement rule, and denied emotional distress damages, where the defendant hospital breached its contractual duty to return a newborn child to his parents by failing to prevent his abduction. Johnson v. Jamaica Hospital, 62 N. Y. 2d 523, 528–529, 467 N. E. 2d 502, 504 (1984); see also id., at 536–537, 467 N. E. 2d, at 509 (Meyer, J., dissenting).

These jurisdictions confine recovery for mental anguish where nonpecuniary contracts are at issue in two main ways. First, a number permit recovery only if the breach also qualifies as "unusually evil," with the precise terminology varying from "reckless" and "willful" to "wanton" and "reprehensible." D. Hoffman & A. Radus, Instructing Juries on Noneconomic Contract Damages, 81 Fordham

L. Rev. 1221, 1227 (2012) (emphasis deleted); see Corbin §59.1, at 546–547; Chmiel, 32 Notre Dame Law., at 484–485; see, *e.g.*, *Giampapa* v. *American Family Mut. Ins. Co.*, 64 P. 3d 230, 238–239 (Colo. 2003).

Second, many States limit recovery for mental anguish to only a narrow "class of contracts upon breach of which the injured party may, if he so elect, bring an action sounding in tort." *Smith* v. *Sanborn State Bank*, 147 Iowa 640, 643, 126 N. W. 779, 780 (1910); Corbin §59.1, at 538; see, *e.g.*, *Johnson*, 62 N. Y. 2d, at 528, 467 N. E. 2d, at 504. Such cases most prominently include those "against carriers, telegraph companies, and innkeepers—all of whom are bound by certain duties that are independent of contract, but who usually also have made a contract for the performance of the duty." Corbin §59.1, at 538; Chmiel, 32 Notre Dame Law., at 488. Others involve "contracts for the carriage or proper disposition of dead bodies," Restatement (Second) of Contracts §353, Comment *a*, which similarly might be seen "as tort cases quite apart from the contract, since one who negligently mishandles a body could be liable in tort . . . even if there were no contract at all." Dobbs §12.4, at 819; see also McCormick §145, at 594–595, 597; see, *e.g.*, *Wright* v. *Beardsley*, 46 Wash. 16, 16–20, 89 P. 172, 172–174 (1907).

Many of these cases unsurprisingly mix contract, quasi-contract, and tort principles together. Dobbs, §12.4, at 818, n. 10 ("The carrier who insults his passenger is liable to him in tort . . . but cases often speak of an implied term in the contract as governing this point."); *Knoxville Traction Co.* v. *Lane*, 103 Tenn. 376, 386, 53 S. W. 557, 560 (1899) ("The gravamen of this action is the defendant's breach of its contract of carriage, which includes . . . the duty to protect the passenger from insult or injury."); *Chamberlain* v. *Chandler*, 5 F. Cas. 413, 414 (No. 2,575) (CC Mass. 1823) (opinion of Story, J.) (ship captain violated the carriage contract's

Opinion of the Court

"implied stipulation against general obscenity").* As such, it makes little sense to treat such cases as establishing or evincing a rule of contract law—a principle with which the United States agrees, Brief for United States as *Amicus Curiae* 31, n. 5 (arguing that cases "based on tort principles" are "not instructive" for purposes of the contract-law analogy).

In the end, it is apparent that the closest our legal system comes to a universal rule—or even a widely followed one—regarding the availability of emotional distress damages in contract actions is "the conventional wisdom . . . that [such] damages are for highly unusual contracts, which do not fit into the core of contract law." Hoffman, 81 Fordham L. Rev., at 1230. As to which "highly unusual contracts" trigger the exceptional allowance of such damages, the only area of agreement is that there is no agreement. There is thus no basis in contract law to maintain that emotional distress damages are "traditionally available in suits for breach of contract," *Barnes*, 536 U. S., at 187, and correspondingly no ground, under our cases, to conclude that federal funding recipients have "clear notice," *Arlington*, 548 U. S., at 296, that they would face such a remedy in private actions brought to enforce the statutes at issue.

---

*The dissent cites McCormick for the proposition that courts did not "always" rely on "accompanying tortious conduct" when allowing recovery of emotional distress damages in the innkeeper, telegraph, and burial cases. *Post*, at 9 (quoting McCormick §145, at 593–594). That misses the point. As McCormick's next sentence explains, the award of emotional distress damages in such cases was "made easier because usually the action could have been brought as for a tort, in which event the tradition against allowing damages for mental distress would be plainly inapplicable." *Id.*, §145, at 594. Put differently, the usual rule barring recovery was not applicable in this idiosyncratic set of cases because, like cases in which punitive damages were awarded, they were "based on contract in name only." Dobbs §12.4, at 818.

Opinion of the Court

\*     \*     \*

For the foregoing reasons, we hold that emotional distress damages are not recoverable under the Spending Clause antidiscrimination statutes we consider here. The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

KAVANAUGH, J., concurring

# SUPREME COURT OF THE UNITED STATES

No. 20–219

## JANE CUMMINGS, PETITIONER *v.* PREMIER REHAB KELLER, P.L.L.C.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[April 28, 2022]

JUSTICE KAVANAUGH, with whom JUSTICE GORSUCH joins, concurring.

In analyzing whether compensatory damages for emotional distress are available under the implied Title VI cause of action, both the Court and the dissent ably employ the contract-law analogy set forth by this Court's precedents. See, *e.g., Barnes* v. *Gorman,* 536 U. S. 181, 186 (2002). The dueling and persuasive opinions illustrate, however, that the contract-law analogy is an imperfect way to determine the remedies for this implied cause of action.

Instead of continuing to rely on that imperfect analogy, I would reorient the inquiry to focus on a background interpretive principle rooted in the Constitution's separation of powers. Congress, not this Court, creates new causes of action. See *Alexander* v. *Sandoval,* 532 U. S. 275, 286–287 (2001). And with respect to existing implied causes of action, Congress, not this Court, should extend those implied causes of action and expand available remedies. Cf. *Hernández* v. *Mesa,* 589 U. S. ___, ___ (2020) (slip op., at 5); see also *Franklin* v. *Gwinnett County Public Schools,* 503 U. S. 60, 77–78 (1992) (Scalia, J., concurring in judgment). In my view, that background interpretive principle—more than contract-law analysis—counsels against judicially authorizing compensatory damages for emotional distress in suits under the implied Title VI cause of action.

BREYER, J., dissenting

# SUPREME COURT OF THE UNITED STATES

No. 20–219

## JANE CUMMINGS, PETITIONER *v.* PREMIER REHAB KELLER, P.L.L.C.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[April 28, 2022]

JUSTICE BREYER, with whom JUSTICE SOTOMAYOR and JUSTICE KAGAN join, dissenting.

Using its Spending Clause authority, Congress has enacted four statutes that prohibit recipients of federal funds from discriminating on the basis of certain protected characteristics, including (depending upon the statute) race, color, national origin, sex, disability, or age. See Civil Rights Act of 1964, Title VI, 42 U. S. C. §2000d; Education Amendments Act of 1972, Title IX, 20 U. S. C. §1681; Rehabilitation Act of 1973, §504, 29 U. S. C. §794; Patient Protection and Affordable Care Act (ACA), §1557, 42 U. S. C. §18116. We have held that victims of intentional violations of these statutes may bring lawsuits seeking to recover, among other relief, compensatory damages. *Franklin* v. *Gwinnett County Public Schools*, 503 U. S. 60, 76 (1992). Today, the Court holds that the compensatory damages available under these statutes cannot include compensation for emotional suffering.

The Court has asked the right question: "[W]ould a prospective funding recipient, at the time it engaged in the process of deciding whether to accept federal dollars, have been aware that it would face such liability?" *Ante*, at 5 (internal quotation marks and alterations omitted). And it has correctly observed that our precedents instruct us to answer this question by drawing an analogy to contract law. But I

2          CUMMINGS v. PREMIER REHAB KELLER

BREYER, J., dissenting

disagree with how the Court has applied that analogy.

The Court looks broadly at all contracts. It says that, most of the time, damages for breach of contract did not include compensation for emotional distress. *Ante*, at 7. And it then holds that emotional distress damages are not available under the Spending Clause statutes at issue here. *Ibid.* But, in my view, contracts analogous to these statutes *did allow* for recovery of emotional distress damages. Emotional distress damages were traditionally available when "the contract or the breach" was "of such a kind that serious emotional disturbance was a particularly likely result." Restatement (Second) of Contracts §353, p. 149 (1979).

The Spending Clause statutes before us prohibit intentional invidious discrimination. That kind of discrimination is particularly likely to cause serious emotional disturbance. Thus, applying our precedents' contract analogy, I would hold that victims of intentional violations of these antidiscrimination statutes can recover compensatory damages for emotional suffering. I respectfully dissent.

I

I begin with agreement. First, like the Court, I recognize that "it is 'beyond dispute that private individuals may sue to enforce' the [four] antidiscrimination statutes we consider here." *Ante*, at 3 (quoting *Barnes* v. *Gorman*, 536 U. S. 181, 185 (2002)). Title VI (prohibiting race discrimination) and Title IX (prohibiting sex discrimination) contain implied rights of action that have been ratified by Congress. *Alexander* v. *Sandoval*, 532 U. S. 275, 280 (2001). The Rehabilitation Act (prohibiting disability discrimination) and the ACA (prohibiting race, sex, disability, and age discrimination) expressly incorporate the rights and remedies available under Title VI. 29 U. S. C. §794a(a)(2); 42 U. S. C. §18116(a). We have treated these statutes as providing "co-extensive" remedies. *Barnes*, 536 U. S., at 185. Thus, the

BREYER, J., dissenting

Court's decision today will affect the remedies available under all four of these statutes, impacting victims of race, sex, disability, and age discrimination alike.

Second, like the Court, I also recognize that recipients of federal funding are subject to a particular form of liability only if they are "*on notice*" that, by accepting the funds, they expose themselves to that form of liability. *Id.*, at 187. And a funding recipient is "generally on notice that it is subject . . . to those remedies traditionally available in suits for breach of contract." *Ibid.* Thus, the basic question here is whether damages for emotional suffering were "traditionally available" as remedies "in suits for breach of contract." *Ibid.*

II

Unlike the Court, though, I believe the answer to that basic question is yes. Damages for emotional suffering have long been available as remedies for suits in breach of contract—at least where the breach was particularly likely to cause suffering of that kind.

A general, overarching principle of contract remedies is set forth in the Restatement (Second) of Contracts: "Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed." §347, Comment *a*, at 112; see also 3 E. Farnsworth, Contracts §12.8, p. 188 (2d ed. 1998) (Farnsworth) ("The basic principle for the measurement of those damages is that of compensation based on the injured party's expectation"); 3 S. Williston, Law of Contracts §1338, p. 2392 (1920) (Williston) ("[T]he general purpose of the law is, and should be, to give compensation:—that is, to put the plaintiff in as good a position as he would have been in had the defendant kept his contract").

BREYER, J., dissenting

This simple principle helps explain why compensatory damages are generally available as remedies and punitive damages are not.  By definition, compensatory damages serve contract law's "general purpose," namely, to "give compensation."  *Ibid.*  But punitive damages go beyond "compensat[ing] the injured party for lost expectation" and instead "put [him] in a better position than had the contract been performed."  3 Farnsworth §12.8, at 193.

The same general principle also helps to explain the many cases in which damages for emotional suffering are *not* available.  Most contracts are commercial contracts entered for pecuniary gain.  Pecuniary remedies are therefore typically sufficient to compensate the injured party for their expected losses.  See, *e.g.,* C. McCormick, Law of Damages §145, p. 592 (1935) (McCormick) ("Most contracts which come before the courts are commercial contracts.  The pecuniary interest is dominant"); 1 J. Sutherland, Law of Damages 156 (1883) (Sutherland) ("In actions upon contract, the losses sustained do not, by reason of the nature of the transactions which they involve, embrace, ordinarily, any other than pecuniary elements"); 3 Farnsworth §12.17, at 894–895 ("[T]he real basis of this rule is that [recovery for emotional distress] is likely to result in disproportionate compensation"); cf. Restatement (Second) of Contracts §351(1), at 135 ("Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made").

Finally, and most importantly here, the same general rule also helps to explain the cases in which contract law *did* make available damages for emotional suffering.  Contract law treatises make clear that expected losses from the breach of a contract entered for *nonpecuniary* purposes might reasonably include *nonpecuniary* harms.  So contract law traditionally does award damages for emotional distress "where other than pecuniary benefits [were] contracted for" or where the breach "was particularly likely to

BREYER, J., dissenting

result in serious emotional disturbance." 3 Williston §1340, at 2396; 3 Farnsworth §12.17, at 895; see also, *e.g.*, Restatement (Second) of Contracts §353, at 149 ("Recovery for emotional disturbance" was allowed where "the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result"); 1 Sutherland 157–158 (damages should be "appropriate to the objects of the contract"); 1 T. Sedgwick, Measure of Damages §45, p. 61 (8th ed. 1891) (Sedgwick) ("'Where other than pecuniary benefits are contracted for, other than pecuniary standards will be applied to the ascertainment of damages flowing from the breach'").

Examples of contracts that gave rise to emotional distress damages under this rule have included, among others, contracts for marriage, see, *e.g.*, 1 Sutherland 156, and n. 4; contracts by common carriers, innkeepers, or places of public resort or entertainment, see, *e.g.*, McCormick §145, at 593, and nn. 48–50; contracts related to the handling of a body, see, *e.g.*, 1 Sedgwick §45, at 62, and n. a; contracts for delivery of a sensitive telegram message, see, *e.g.*, *id.*, at 62, and n. b; and more. In these cases, emotional distress damages are compensatory because they "'make good the wrong done.'" *Franklin*, 503 U. S., at 46; see also *Memphis Community School Dist.* v. *Stachura*, 477 U. S. 299, 307 (1986).

III

Does breach of a promise not to discriminate fall into this category? I should think so. The statutes before us seek to eradicate invidious discrimination. That purpose is clearly nonpecuniary. And discrimination based on race, color, national origin, sex, age, or disability is particularly likely to cause serious emotional harm. Often, emotional injury is the primary (sometimes the only) harm caused by discrimination, with pecuniary injury at most secondary. Consider, for example, the plaintiff in *Franklin*—a high school student who was repeatedly sexually assaulted by her

BREYER, J., dissenting

teacher.  503 U. S., at 63–64.  Or the plaintiff in *Tennessee*
v. *Lane*, 541 U. S. 509 (2004), who used a wheelchair and,
because a building lacked wheelchair accessibility, was
forced to crawl up two flights of stairs.  *Id.*, at 513–514.  Or
the many historical examples of racial segregation in which
Black patrons were made to use separate facilities or ser-
vices.  Regardless of whether financial injuries were pre-
sent in these cases, the major (and foreseeable) harm was
the emotional distress caused by the indignity and humili-
ation of discrimination itself.

As a Member of this Court noted in respect to the Civil
Rights Act of 1964, Congress' antidiscrimination laws seek
"the vindication of human dignity and not mere economics."
*Heart of Atlanta Motel, Inc.* v. *United States*, 379 U. S. 241,
291 (1964) (Goldberg, J., concurring).  Quoting the Senate
Commerce Committee, Justice Goldberg observed:

> "'Discrimination is not simply dollars and cents, ham-
> burgers and movies; it is the humiliation, frustration,
> and embarrassment that a person must surely feel
> when he is told that he is unacceptable as a member of
> the public because of his race or color.  It is equally the
> inability to explain to a child that regardless of educa-
> tion, civility, courtesy, and morality he will be denied
> the right to enjoy equal treatment, even though he be a
> citizen of the United States and may well be called
> upon to lay down his life to assure this Nation contin-
> ues.'"  *Id.*, at 292 (quoting S. Rep. No. 872, 88th Cong.,
> 2d Sess., 16 (1964)).

It is difficult to believe that prospective funding recipi-
ents would be unaware that intentional discrimination
based on race, sex, age, or disability is particularly likely to
cause emotional suffering.  Nor do I believe they would be
unaware that, were an analogous contractual breach at is-
sue, they could be held legally liable for causing suffering of
that kind.  The contract rule allowing emotional distress

BREYER, J., dissenting

damages under such circumstances is neither obscure nor unsettled, as the Court claims. *Ante*, at 8, 11–12. To the contrary, it is clearly laid out in the Restatement (Second) of Contracts: "Recovery for emotional disturbance will be excluded unless the breach also caused bodily harm *or the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result.*" §353, at 149 (emphasis added). And the Restatement's rule is well supported by treatise writers, who have described the law similarly. See, *e.g.*, 3 Farnsworth §12.17, at 895; 1 Sedgwick §45, at 62; 16 J. Murray, Corbin on Contracts §AG–59.01, p. 855 (2017) ("Emotional damages arising from racial or other forms of discrimination are clearly foreseeable. There should be no question about their recovery in a contract action where such conduct is proven"). I would therefore conclude that contract law is sufficiently clear to put prospective funding recipients on notice that intentional discrimination can expose them to potential liability for emotional suffering.

IV

In concluding otherwise, the Court invokes our decision in *Barnes*. In *Barnes*, we reaffirmed that funding recipients could be held liable for compensatory damages because compensatory damages are a "for[m] of relief traditionally available in suits for breach of contract." 536 U. S., at 187. But, we held, they are not liable for punitive damages because punitive damages were "generally not available for breach of contract." *Ibid.*

The Court today reads *Barnes* to imply that prospective funding recipients can only be expected to be aware of "basic, general rules," not exceptions or subsidiary rules that govern specific circumstances. *Ante*, at 11. How does the Court derive that restrictive approach from *Barnes*, which did not purport to announce such a limitation? Because, the Court says, punitive damages were sometimes

BREYER, J., dissenting

available in suits for breach of contract where the breach was "'also a tort for which punitive damages are recoverable.'" *Ante*, at 9 (quoting Restatement (Second) of Contracts §355). The Court assumes that *Barnes* must have refused to consider any exceptions at all because otherwise it would have relied on this exception to hold that punitive damages *were* available. *Ante*, at 9. The Court believes that damages for emotional suffering are similar: It says they, too, are available only under an exception to the general rule, and that exception is too "'fine-grained'" to put federal funding recipients on notice of their potential exposure to liability. *Ante*, at 8 (quoting Brief for Petitioner 33).

The Court's comparison to punitive damages is, in my view, unpersuasive. Punitive damages are not embraced by *Barnes'* contract-law analogy because they do not serve contract law's central purpose of "compensat[ing] the injured party"; instead, they "punish the party in breach." Restatement (Second) of Contracts §355, Comment *a*, at 154; see also *Barnes*, 536 U. S., at 189 (distinguishing punitive damages, which are unavailable, from compensatory damages, which are available, because the former do not "'make good the wrong done'"). Accordingly, the punitive damages exception cited by the Court does not rely on contract-law principles at all, but rather, on tort law. The Restatement clarifies that, when contract and tort claims may overlap, contract law "does not preclude an award of punitive damages . . . if such an award would be proper *under the law of torts*." Restatement (Second) of Contracts §355, Comment *b*, at 155 (emphasis added); see also *id.*, at 156 (including Illustrations in which the "right to recover punitive damages is governed by Restatement, Second, Torts §908"). This special feature makes the punitive damages exception an inapt comparator for *Barnes'* *contract*-law analogy.

The same is not true of emotional distress damages. The Restatement does not attribute the availability of emotional

BREYER, J., dissenting

distress damages to tort rather than contract law. See Re-
statement (Second) of Contracts §353, at 149; see also
McCormick §145, at 593–594 ("Sometimes reliance is
placed upon accompanying tortious conduct such as assault
or defamation . . . but *not always, nor do these elements
seem essential*" (emphasis added)); *e.g., Aaron* v. *Ward*, 203
N. Y. 351, 354, 96 N. E. 736, 737 (1911) ("The action is for a
breach of the defendant's contract and not for a tortious ex-
pulsion"). That makes sense because, unlike punitive dam-
ages, emotional distress damages can, and do, serve con-
tract law's central purpose of compensating the injured
party for their expected losses, at least where the contract
secured primarily nonpecuniary benefits and contemplated
primarily nonpecuniary injuries. As I said above, in such
cases, emotional distress damages are a form of compensa-
tory damages that "'make good the wrong done.'" *Franklin*,
503 U. S., at 66; see also *Memphis Community School Dist.*,
477 U. S., at 306–307, and n. 9.

I have already explained above why I believe federal
funding recipients would be aware that intentional invidi-
ous discrimination is particularly likely to cause emotional
suffering. And I have also explained why, aware of general
principles of contract law, they would also be aware that
damages for emotional suffering are available for breaches
of contract "where other than pecuniary benefits [were] con-
tracted for" or where the breach "was particularly likely to
result in serious emotional disturbance." 3 Williston §1340,
at 2396; 3 Farnsworth §12.17, at 895; *supra*, at 4–5. Noth-
ing in our opinion in *Barnes* requires us to ignore these "'di-
rectly applicable'" contract rules in favor of the less appli-
cable, "general" rule on which the Court relies. *Ante*, at 8
(quoting Brief for Petitioner 35). Indeed, reliance on an
analogy only works when we compare things that are actu-
ally analogous. Here, the rules that govern analogous
breaches of contract tell us that emotional distress damages

BREYER, J., dissenting

can be available for violations of statutes that prohibit intentional discrimination.

V

Finally, we might recall *why* we look to contract rules at all. The contract-law analogy is a tool for answering the ultimate question whether federal funding recipients can appropriately be held liable for emotional suffering. Cf. *Barnes*, 536 U. S., at 191 (Souter, J., concurring) (warning about the limitations of the contract-law analogy). In answering that question, we must remain mindful of the need to ensure a "sensible remedial scheme that best comports with the statute." *Gebser* v. *Lago Vista Independent School Dist.*, 524 U. S. 274, 284 (1998). The Court's holding today will not help to achieve that result.

Instead, the Court's decision creates an anomaly. Other antidiscrimination statutes, for which Congress has provided an express cause of action, permit recovery of compensatory damages for emotional distress. See 42 U. S. C. §1981a(b)(3) (expressly providing for compensatory damages, including damages for "emotional pain, suffering," and "mental anguish" under Title VII of the Civil Rights Act); *Memphis Community School Dist.*, 477 U. S., at 307 (allowing recovery under Rev. Stat. §1979, 42 U. S. C. §1983, of compensatory damages for "'personal humiliation, and mental anguish and suffering'"). Employees who suffer discrimination at the hands of their employers can recover damages for emotional suffering, as can individuals who suffer discrimination at the hands of state officials. But, until Congress acts to fix this inequity, the Court's decision today means that those same remedies will be denied to students who suffer discrimination at the hands of their teachers, patients who suffer discrimination at the hands of their doctors, and others.

It is difficult to square the Court's holding with the basic purposes that antidiscrimination laws seek to serve. One

BREYER, J., dissenting

such purpose, as I have said, is to vindicate "human dignity and not mere economics." *Heart of Atlanta*, 379 U. S., at 291 (Goldberg, J., concurring). But the Court's decision today allows victims of discrimination to recover damages only if they can prove that they have suffered economic harm, even though the primary harm inflicted by discrimination is rarely economic. Indeed, victims of intentional discrimination may sometimes suffer profound emotional injury without any attendant pecuniary harms. See, *e.g.*, *Franklin*, 503 U. S., at 63–64, 76. The Court's decision today will leave those victims with no remedy at all.

\*    \*    \*

For all of these reasons, I respectfully dissent.

# AUTHORITY 2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

JULIA BONNEWITZ,                          §
                                          §
              Plaintiff,                   §          Case No. 6:21-cv-00491-ADA-DTG
                                          §
v.                                        §
                                          §
BAYLOR UNIVERSITY,                        §
                                          §
              Defendant.                   §

REPORT AND RECOMMENDATION OF
THE UNITED STATES MAGISTRATE JUDGE

TO:   THE HONORABLE ALAN D ALBRIGHT,
      UNITED STATES DISTRICT JUDGE

This Report and Recommendation is submitted to the Court pursuant to 28 U.S.C.

§ 636(b)(1)(C), Fed. R. Civ. P. 72(b), and Rules 1(f) and 4(b) of Appendix C of the Local Rules

of the United States District Court for the Western District of Texas, Local Rules for the

Assignment of Duties to United States Magistrate Judges. Before the Court is Defendant's 12(b)(6)

Motion to Dismiss for Failure to State a Claim. ECF No. 7. After careful consideration of the briefs

and the applicable law, the Court **RECOMMENDS** that Defendant's Motion be **GRANTED**.

## I.   FACTUAL BACKGROUND

In the Fall of 2017, Plaintiff Julia Bonnewitz sought to try out for Baylor University's

Women's Tennis team but was told that she should join a "club" team instead. ECF No. 6 ¶ 14.

Ms. Bonnewitz later participated in a Title IX investigation involving the Baylor Tennis Director

and Men's Tennis coach, Brian Boland, during the Summer of 2020. ECF No. 6 ¶ 43. Following

the investigation, Defendant Baylor University again denied Ms. Bonnewitz an opportunity to try

1

out for the Women's Tennis team, stating that there was no spot for her and that the decision had been made before the Title IX investigation. ECF No. 6 ¶¶ 57, 59.

Plaintiff filed this lawsuit accusing Baylor of retaliation for her participation in the Title IX investigation. *Id.* ¶ 71. Plaintiff claims to have suffered emotional pain and humiliation and seeks monetary damages. *Id.* ¶ 72.

Defendant moves to dismiss the case under Federal Rule of Civil Procedure 12(b)(6). ECF No. 7.

## II.    LEGAL STANDARD

Rule 12(b)(6) requires that a complaint contain sufficient factual matter, if accepted as true, to "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this factual plausibility standard, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," based on "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* However, in resolving a motion to dismiss for failure to state a claim, the question is "not whether [the plaintiff] will ultimately prevail, . . . but whether [the] complaint was sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011). "The court's task is to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citing *Iqbal*, 556 U.S. at 678).

2

## III.    DISCUSSION

### A.    Defendant does not conflate an evidentiary standard and a pleading standard.

As an initial manner, Plaintiff alleges that "Defendant conflates an evidentiary standard and a pleading standard." ECF No. 8 at 14. The Court disagrees with Plaintiff's framing of Defendant's arguments. Defendant does not argue that Plaintiff must prove a prima facie case, nor does Defendant argue against the facts as pled by Plaintiff. Defendant argues that the facts as pled by Plaintiff in her Complaint, even if taken as true, do not state a legally cognizable claim that is plausible. *See generally* ECF No. 7. It is appropriate to consider the elements of a cause of action at the 12(b)(6) stage, as Plaintiff is "required to allege facts to satisfy the elements of a cause of action." *Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017).

*mat sur claim*

### B.    Plaintiff has not pled facts that state a plausible claim for Title IX retaliation.

To survive a 12(b)(6) motion to dismiss on a Title IX retaliation claim, Plaintiff must plead facts that state a plausible claim for retaliation. A claim for retaliation under Title IX requires the plaintiff to show that (1) she engaged in a protected activity; (2) she suffered an adverse action; and (3) a causal connection exists between the protected activity and the adverse action. *Willis v. Cleco Corp.*, 749 F.3d 214, 317 (5th Cir. 2014).

Defendant does not allege that Plaintiff's allegations of participation in a protected activity are insufficient but does challenge Plaintiff's complaint as to the other two elements.

#### 1.  Plaintiff has not alleged that Defendant's official policy violated Title IX or that Defendant was deliberately indifferent.

Defendant argues that Plaintiff "has not identified any official policy that contributed to the alleged retaliation," thus, Plaintiff must allege deliberate indifference that allowed or created

3

the alleged retaliatory conduct. ECF No. 7 at 6. Plaintiff does not address this argument in either her Response or Notice of Supplemental Authority.[1] *See* ECF No. 8, ECF No. 14.

A retaliation plaintiff must show that the funding recipient or its representatives took an adverse action against her—which typically means the funding recipient itself signed off on the adverse action. *E.g. Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 171–72 (2005). Plaintiff's Complaint does not allege an official policy constituted the alleged retaliatory conduct. "When a case does not involve the funding recipient's 'official policy,' Title VI and Title IX require deliberate indifference." *Sewell v. Monroe City School Board*, 974 F.3d 577, 588 (5th Cir. 2020) (affirming dismissal of a retaliation claim due to a lack of deliberate indifference pleading). Plaintiff has not pled facts supporting actual notice and deliberate indifference to the alleged retaliatory conduct. As a result, this is one basis on which her claims should be dismissed.

## 2. Plaintiff's complaint alleges sufficient facts that support an inference that she suffered an adverse material action.

Defendant argues that Plaintiff's complaint is insufficient because the only allegation of a material adverse action is the continued denial of a chance to "tryout" for the tennis team, which Defendant claims is based on the assumption that "Baylor affords *any* student a chance to tryout for any athletic team despite a prior denial of such a chance." ECF No. 7 at 10. Plaintiff argues that an adverse action in the Title IX context can include a denial of an educational opportunity to try out for a team. ECF No. 8 at 11.

Only retaliation that produces an injury or harm resulting from an action that is materially adverse is actionable. *Burlington N. & Santa Fe Ry. Co. v. White*, 584 U.S. 53, 68 (2006). An

---

[1] Plaintiff briefly attempts to distinguish *Sewell v. Monroe City Sch. Bd.* in a footnote to her claim regarding the causal connection, but does not address the necessity of deliberate indifference. ECF No. 8 at 13, n. 12.

4

action is "materially adverse" for purposes of a Title IX retaliation claim if it might have dissuaded a reasonable person from making or supporting a charge of discrimination. *See id.* at 69.

Plaintiff has pled facts that support an inference that she suffered a materially adverse action. In this case, Plaintiff must plead that a person in her position—a senior who Baylor had previously denied the opportunity join the tennis team—would not participate in the investigation out of fear that she would not be given an opportunity to tryout. Plaintiff acknowledges in her complaint that she had been denied an opportunity to join the Women's Tennis team three years before participating in the protected activity. Plaintiff also pled, however, facts supporting the allegation that she was actively working towards an opportunity to tryout and was encouraged by the Men's Tennis coach to try and join the Women's Tennis team. *See* ECF No. 6 at ¶¶ 15, 17–19. Plaintiff further alleged several specific allegations of inappropriate conduct by the Men's Tennis team coach, and that she participated in an investigation of that coach only after expressing her concern about participating in the Title IX investigation because she wanted to play tennis. *Id.* at ¶¶ 41–53. Taken as true, these facts support an inference that Plaintiff suffered a materially adverse action. Plaintiff sufficiently pled facts that plausibly show that a reasonable person in her position would not participate in the protected activity out of fear that she would not be given a tryout.

### 3. Plaintiff's complaint fails to allege sufficient facts to support a causal connection between the protected activity and the alleged adverse action.

Defendant argues that Plaintiff did not "plead sufficient facts to demonstrate that there was a causal connection between her engagement in a protected activity in 2020 and the claimed adverse action of refusing her a tryout in August 2020, since the coach denied her a tryout in 2017." ECF No. 7 at 2. Plaintiff contends that a causal connection exists because "only 39 days elapsed between the beginning of the participation of the investigation and Defendant's refusal of the educational and athletic opportunity of the tryout." ECF No. 8 at 12.

The Court notes that Plaintiff has not pled sufficient facts to support an inference of but-for causation. Title IX retaliation claims require that Plaintiff demonstrate that the desire to retaliate was the but-for cause of the adverse action. *Univ. of Tex. Sw. Med. Ctr. V. Nassar*, 570 U.S. 338, 352 (2013). Plaintiff does not plead sufficient facts to allege that the 2020 denial of an opportunity to try out for the Women's Tennis team resulted from her participation in the Title IX investigation, rather than a continuation of the 2017 text saying that "she could not join the tennis team." ECF No. 6 at ¶ 14. The facts as pled by Plaintiff show that Defendant's conduct with respect to Plaintiff's ability to tryout both before and after her participation in the Title IX investigation was consistent. Plaintiff alleges that she was communicating with Boland to ask for help joining the Women's Tennis team, and that he told her he "would need to think about what the best approach would be." *Id*. at ¶ 19. Plaintiff has not alleged any facts showing that any individual at Baylor had offered her a tryout before participation in the Title IX investigation or even suggested that she would be given a tryout. Plaintiff has affirmatively alleged that she was previously denied the opportunity to join the team, years before participation in the Title IX investigation. An adverse action cannot be Plaintiff's basis for her retaliation claim if the action was set in motion before she participated in the Title IX investigation. *Piligian v. Icahn Sch. Of Med. at Mount Sinai*, 490 F.Supp.3d 707, 722 (S.D.N.Y. 2020). Plaintiff has not pled any facts that would suggest a causal relationship between her participation in the Title IX investigation and the adverse activity complained of.

## C.    Plaintiff specifies damages for which there is no legal relief under Title IX.

Plaintiff claims that she suffered emotional pain and humiliation and seeks monetary damages. ECF No. 6 ¶ 72. Defendant argues that in light of the Supreme Court's recent decision in *Cummings v. Premier Rehab Keller PLLC*, which prohibits emotional distress damages for Title

IX retaliation claims, Plaintiff has only claimed damages for which there is no legal relief, and her claim should be dismissed. ECF No. 17 at 3; 142 S.Ct. 1562 (2022). Plaintiff asserts that she has adequately pled "monetary damages." ECF No. 19 at 1.

On April 28, 2022, the U.S. Supreme Court barred recovery of emotional distress damages under anti-discriminatory legislation such as Title IX. *Cummings v. Premier Rehab Keller PLLC*, 142 S.Ct. 1562, 1572 (2022). Congress passed Title IX legislation pursuant to its power granted by the Spending Clause of the Constitution. *Id.* at 1568. Spending Clause legislation is analogous to a contract because it operates based on consent. *Id.* at 1570. Recipients must agree to comply with federally imposed conditions in return for federal funding. *Id.* A particular remedy is available in a Title IX action only if the recipient of the funds is "on notice" that, by accepting federal funding, it exposes itself to liability of that nature. *Id.* Following the contract analogy, a funding recipient is not only on notice of those damages explicitly provided in the legislation but also of those remedies traditionally available in suits for breach of contract. *Id.* at 1571. Generally, emotional distress damages are not available for breach of contract. *Id.* at 1565. Some jurisdictions allow for these damages in particular settings, but many states reject this approach. *Id.* For these reasons, the Court held that federal funding recipients do not have "clear notice" of liability for emotional distress damages. *Id.* at 1576.

Plaintiff therefore seeks damages that are not recoverable under Title IX. Plaintiff alleges that she "suffered emotional pain and humiliation and seeks monetary damages." ECF No. 6 ¶ 72. Damages for emotional distress are not recoverable for violations of anti-discrimination statutes, including Title IX. *See Cummings*, 142 S.Ct. at 1572. In response to *Cummings*, Plaintiff concedes that emotional distress damages are not available. ECF No. 19 at 1.   However, Plaintiff also seeks compensatory relief for the claimed injury in the form of unspecified "monetary damages". *Id.*

7

In Plaintiff's Court-Ordered Supplementary Memorandum, she attempts to sever the claimed injury and the relief sought. ECF No. 19 at 3. Plaintiff argues that she still has a right to pursue a remedy of monetary damages but has failed to specify what comprises those damages. It is unclear what monetary damages Plaintiff believes are encompassed in her Complaint, and Plaintiff does not provide an explanation in her Supplementary Memorandum. *See* ECF No. 19.

As Plaintiff's Amended Complaint is currently written, the only specific damages that Plaintiff is seeking are for emotional pain and humiliation. Thus, even assuming the truth of Plaintiff's factual allegations, the specific damages alleged by Plaintiff are unavailable under *Cummings* and the "monetary damages" fail to include sufficient factual detail to apprise Defendant of the specific damages Plaintiff is seeking. The Court thus believes that the Motion to Dismiss should be granted.

**D.   Plaintiff should be granted leave to amend her complaint.**

Decisions on motions to dismiss are "entrusted to the sound discretion of the district court." *Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004). Under Federal Rule of Civil Procedure 15(a)(2), leave to amend should be freely given when justice so requires. *Id.* In determining whether to grant leave to amend, courts consider "1) undue delay, 2) bad faith or dilatory motive, 3) repeated failure to cure deficiencies by previous amendments, 4) undue prejudice to the opposing party, and 5) futility of the amendment." *Id*. Absent any such valid justification, leave to amend should be freely given. *Id.*

Accordingly, the Court recommends that the Motion to Dismiss (ECF No. 7) be granted without prejudice and with leave to amend the complaint.

8

## IV. RECOMMENDATION

For the above reasons, it is the **RECOMMENDATION** of the United States Magistrate Judge to the United States District Judge that Defendant's Motion to Dismiss (ECF No. 7) be **GRANTED** without prejudice with leave to amend the complaint within fourteen days of an order granting Defendant's Motion and dismissing the Amended Complaint (ECF No. 6).

## V. OBJECTIONS

The parties may wish to file objections to this Report and Recommendation. Parties filing objections must specifically identify those findings or recommendations to which they object. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. U.S. Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v Arn*, 474 U.S. 140, 150–53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (en banc). Except upon grounds of plain error, failing to object shall further bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas*, 474 U.S. at 150–53; *Douglass*, 79 F.3d at 1415.

**SIGNED** this 12th day of July, 2022.

DEREK T. GILLILAND
UNITED STATES MAGISTRATE JUDGE

# AUTHORITY 3

**A** Neutral
As of: August 17, 2022 5:49 PM Z

# Fantasia v. Montefiore New Rochelle

United States District Court for the Southern District of New York

June 16, 2022, Decided; June 16, 2022, Filed

19 CV 11054 (VB)

**Reporter**
2022 U.S. Dist. LEXIS 107935 *

IRMA FANTASIA, Plaintiff, v. MONTEFIORE NEW ROCHELLE, Defendant.

## Core Terms

damages, nominal damages, dignitary, compensatory damages, emotional-distress, violations, subject-matter, moot, contends, parties, injunctive

**Counsel:** [*1] For Irma Fantasia, Plaintiff: Andrew Michael Clark, Eisenberg & Baum, LLP, New York, NY; David John Hommel, Jr, Eisenberg & Baum, LLP, Penthouse, New York, NY; Andrew Rozynski, Eisenberg and Baum LLP, New York, NY.

For Montefiore New Rochelle, Defendant: Roy W. Breitenbach, LEAD ATTORNEY, Harris Beach PLLC, The Omni, Uniondale, NY; Daniel Robert Lecours, Harris Beach PLLC, Albany, NY.

For United States of America, Interested Party: Natasha Waglow Teleanu, LEAD ATTORNEY, United States Attorney's Office, SDNY, New York, NY.

**Judges:** Vincent L. Briccetti, United States District Judge.

**Opinion by:** Vincent L. Briccetti

## Opinion

### OPINION AND ORDER

Briccetti, J.:

Plaintiff Irma Fantasia brings this action against Montefiore New Rochelle, asserting claims pursuant to _Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794_; _Section 1557 of the Affordable Care Act ("ACA"), 42 U.S.C. § 18116_; and the New York State Human Rights Law ("NYSHRL"), _N.Y. Exec. Law § 296(2)_.

At a status conference held on April 28, 2022, the Court directed the parties to brief whether subject-matter jurisdiction still exists in this case in light of the Supreme Court's decision in _Cummings v. Premier Rehab Keller, P.L.L.C., 142 S. Ct. 1562, 212 L. Ed. 2d 552 (2022)_.

For the following reasons, the Court concludes subject-matter jurisdiction exists, and the case shall proceed to trial.

### BACKGROUND

The Court presumes the parties' familiarity [*2] with the factual background of this case and summarizes only the relevant procedural history.

Plaintiff commenced this action on December 2, 2019. (Doc. #1). In her complaint, plaintiff asserted claims pursuant to _Title III of the Americans with Disabilities Act ("ADA"), Section 504_ of the RA, _Section 1557 of the ACA_, and the NYSHRL; and she sought compensatory damages, injunctive relief, and attorney's fees and costs, as well as a declaratory judgment that defendant violated these statutes.

After the close of discovery, the parties cross-moved for summary judgment. In plaintiff's motion, she withdrew her request for injunctive or declaratory relief. On February 1, 2022, the Court granted in part and denied in part defendant's motion for summary judgment and denied plaintiff's cross-motion for summary judgment; dismissed plaintiff's ADA claim; and permitted her RA, ACA, and NYSHRL claims for emotional-distress damages to proceed to trial. _Fantasia v. Montefiore New Rochelle, 2022 U.S. Dist. LEXIS 18058, 2022 WL 294078 (S.D.N.Y. Feb. 1, 2022)_.

On April 28, 2022, the Supreme Court decided

*Cummings v. Premier Rehab Keller, P.L.L.C.*, in which the Court held that emotional-distress damages are not recoverable in private actions brought to enforce the RA or ACA. *142 S. Ct. at 1576*. The Court reasoned that these statutes were enacted pursuant to Congress's authority under the Spending Clause, *U.S. Const. art. I, § 8, cl. 1*, which **[*3]** grants Congress the power "to set the terms on which it disperses federal funds" "in the nature of a contract," and thus any remedy for violation of those terms must be one "traditionally available in suits for breach of contract." *Cummings v. Premier Rehab Keller, P.L.L.C., 142 S. Ct. at 1568, 1576*. Emotional-distress damages, the Court determined, are not traditionally available in contract and thus are not an available remedy in private actions brought pursuant to these *Spending Clause* statutes. *Id. at 1574-76*.

At a status conference on April 28, 2022, the Court directed the parties to brief whether subject-matter jurisdiction still exists in this case in light of the Supreme Court's decision.

On May 19, 2022, defendant filed a brief arguing this case should be dismissed as moot. (Doc. #69).

On June 2, 2022, plaintiff filed a brief arguing the Court still possessed subject-matter jurisdiction over her claims. (Doc. #70 ("Pl. Br.")). Specifically, plaintiff contends *Cummings* was wrongly decided and does not apply to her claims, but, if *Cummings* does apply and does preclude an award of emotional-distress damages, her claims are not moot because she is entitled to seek "expectation" damages, damages for "dignitary harm," or nominal damages at trial.

## DISCUSSION

### I. Legal Standard

The Court "ha[s] an **[*4]** independent obligation to determine whether subject-matter jurisdiction exists." *Arbaugh v. Y&H Corp., 546 U.S. 500, 514, 126 S. Ct. 1235, 163 L. Ed. 2d 1097 (2006)*.[1] If it "determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." *Fed. R. Civ. P. 12(h)(3)*. Federal courts are courts of limited jurisdiction, and they are empowered to decide only "Cases" or "Controversies." *U.S. Const. art. III, § 2, cl. 1*. "There is . . . no case or controversy, and a suit becomes moot,

when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Chafin v. Chafin, 568 U.S. 165, 172, 133 S. Ct. 1017, 185 L. Ed. 2d 1 (2013)*. For example, "if in the course of litigation a court finds that it can no longer provide a plaintiff with any effectual relief, the case generally is moot." *Uzuegbunam v. Preczewski, 141 S. Ct. 792, 796, 209 L. Ed. 2d 94 (2021)*.

### II. Analysis

### A. Expectation Damages

First, plaintiff contends she is entitled to pursue compensatory damages in the form of "expectation" damages for defendant's alleged violations of the RA and ACA.

The Court disagrees.

As an initial matter, although plaintiff contends this Court should reject *Cummings*'s holding because the case was wrongly decided, the Court must and will follow binding Supreme Court precedent. Moreover, the Court is not persuaded by plaintiff's argument that, by applying *Cummings* to this dispute, it would be applying the decision "retroactiv[ely]." **[*5]** (See Pl. Br. at 4). The Supreme Court was clear that, when the defendant in *Cummings* accepted federal funds in 2016, it did so without "clear notice" that it could "face [emotional-distress damages] in private actions brought to enforce the" RA or ACA and, as a result, the plaintiff could not recover emotional-distress damages. *Cummings v. Premier Rehab Keller, P.L.L.C., 142 S. Ct. at 1568, 1576*. Thus, this Court would not be applying *Cummings* retroactively to determine that defendant, which treated plaintiff in April 2017, also did not have "clear notice" that liability for emotional-distress damages was a potential consequence of accepting federal funds at that time.

As explained above, the Supreme Court has determined that any remedy for violation of the RA or ACA must be one "traditionally available in suits for breach of contract." *Cummings v. Premier Rehab Keller, P.L.L.C., 142 S. Ct. at 1576*.

Compensatory damages other than emotional-distress damages are generally available in contract cases. For example, one type of compensatory damages available in contract is "expectation" damages, which are meant to provide the plaintiff "the benefit of the bargain that he or she made by awarding a sum of money that will place [him or her] in as good a position as he or she would

---

[1] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

have been in had the contract been performed." 24 Williston [*6] on Contracts § 64.3 (4th ed. 2022).

A party's expectation damages are measured by:

(a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus

(b) any other loss, including incidental or consequential loss, caused by the breach, less

(c) any cost or other loss that he has avoided by not having to perform.

*Restatement (Second) of Contracts § 347.* That said, any recovery is limited to "an amount that the evidence permits to be established with reasonable certainty." Id. § 352.

For example, in a publishing contract, if the publisher repudiates the contract and the author is unable to publish his novel with another publisher, the author's expectation damages "include the loss of royalties that he would have received had the novel been published together with the value to him of the resulting enhancement of his reputation." *Restatement (Second) of Contracts § 347 illus. 1.* However, if the author cannot estimate his loss of royalties or the value of any lost reputational enhancement "with reasonable certainty, he cannot recover damages for that loss." Id. § 352 illus. 1.

In theory, a plaintiff could pursue expectation damages as a remedy for violations of the RA or ACA. "When a federal-funds recipient violates conditions of Spending Clause legislation, the wrong done [*7] is the failure to provide what the contractual obligation requires; and that wrong is 'made good' when the recipient compensates the . . . third-party beneficiary . . . for the loss caused by that failure." *Barnes v. Gorman, 536 U.S. 181, 189, 122 S. Ct. 2097, 153 L. Ed. 2d 230 (2002).* When a plaintiff contends that a recipient of federal funds violated its contract with the federal government by discriminating against her on the basis of her disability, as a third-party beneficiary to the agreement between the receipt and the government, that plaintiff could be entitled to seek expectation damages flowing from that breach. See, e.g., *Montgomery v. District of Columbia, 2022 U.S. Dist. LEXIS 92281, 2022 WL 1618741, at *25-26 (D.D.C. May 23, 2022).*

However, plaintiff in this case has not offered sufficient evidence such that a factfinder could determine her expectation damages with reasonable certainty. Plaintiff implies defendant's failure to provide an interpreter diminished the value of the treatment defendant provided to her during her hospital stay. Specifically, she suggests the loss she experienced because of defendant's alleged discrimination was the loss of her daughter as "emotional support" because her daughter was instead forced to provide "medical interpretation." (Pl. Br. at 6). For one, this is clearly a rebranding of emotional-distress damages, which are [*8] precluded by *Cummings.* For another, plaintiff does not explain how a factfinder would quantify this loss with reasonable certainty. Instead, plaintiff's submission suggests the opposite—she describes this loss of emotional support as one she "will never be able to recover" (Pl. Br. at 6), not a loss that could reasonably be calculated by a jury.

Accordingly, plaintiff may not seek expectation damages at trial.

## B. Damages for Dignitary Harm

Second, plaintiff contends she is entitled to seek compensatory damages for dignitary harm caused by defendant's alleged violations of the RA and ACA.

The Court disagrees.

Laws mandating equal access to public places and federal programs, such as the statutes at issue in this case, were designed to address "the deprivation of personal dignity that surely accompanies denials of equal access." See *Heart of Atl. Motel, Inc. v. United States, 379 U.S. 241, 250, 85 S. Ct. 348, 13 L. Ed. 2d 258 (1964).*

Moreover, "intentional discrimination is frequently a wanton, reprehensible tort." *Cummings v. Premier Rehab Keller, P.L.L.C., 142 S. Ct. at 1572-73.* Torts of this type, that is, invasions or deprivations of a person's dignity, are sometimes called "dignitary torts." Dan B. Dobbs et al., The Law of Torts § 514 (2d ed. 2021) ("Dignitary torts involve legally cognizable invasions of rights that stand independent of both physical and [*9] economic harms, that is, invasions of human dignity in the sense of human worth."). Certain statutory schemes allow parties to a contract to recover tort damages to compensate for emotional distress. 3 Dan B. Dobbs, Law of Remedies § 12.5(1) (2d ed. 1993).

Here, the Court concludes damages for dignitary harm are not an available remedy for violations of the RA or ACA.

Discrimination is a dignitary tort, and compensatory damages are a generally accepted remedy for such

torts. See *Restatement (Second) of Torts § 901 cmts. a*, c. However, only specific statutes permit recovery of tort damages in contract cases, and the Supreme Court held in *Cummings* that the RA and ACA do not permit such recovery. See *Cummings v. Premier Rehab Keller, P.L.L.C., 142 S. Ct. at 1576*.

Moreover, just because dignitary harm is potentially caused by violations of the RA and ACA does not mean that such harm must be redressed by compensatory damages. For example, dignitary harm may be remedied by injunctive relief, for example, an order directing a public accommodation to take remedial steps to provide equal access to patrons, e.g., *Bronx Indep. Living Servs. v. Metro. Transp. Auth., 2021 U.S. Dist. LEXIS 59672, 2021 WL 1177740, at *19-20 (S.D.N.Y. Mar. 29, 2021)* (class action lawsuit brought by Bronx residents with mobility disabilities seeking an injunction directing state authorities to make a Bronx subway station wheelchair accessible), or by an award **[*10]** of nominal damages, e.g., Mueller v. Swift, 2017 WL 8218227 (D. Colo. Aug. 14, 2017) (awarding Taylor Swift $1 in nominal damages on her sexual assault counterclaim).

Further, in one of the cases plaintiff cites, Shaver v. Independent Stave Co., when the Eighth Circuit enumerated potential remedies for the dignitary harm suffered by an ADA tester, it did not mention compensatory damages. *350 F.3d 716, 725 (8th Cir. 2003)* ("nominal damages, . . . attorneys' fees, exemplary damages, and injunctive relief"). Plaintiff's other authorities address only whether dignitary harm constitutes a concrete, particularized injury for the purposes of standing, not whether such an injury can be redressed by an award of compensatory damages. See, e.g., *Griffin v. Dep't of Lab. Fed. Credit Union, 912 F.3d 649 (4th Cir. 2019)* (blind ADA tester did not establish standing to challenge a credit union's inaccessible website); *Carello v. Aurora Policemen Credit Union, 930 F.3d 830 (7th Cir. 2019)* (same); *Camarillo v. Carrols Corp., 518 F.3d 153 (2d Cir. 2008)* (per curiam) (legally blind plaintiff had standing to assert Title III ADA claims against a local restaurant "at least at this stage in the litigation" because she suffered an injury). Thus, even if plaintiff were able to show she suffered dignitary harm at trial, such harm would not entitle her to compensatory damages.

Accordingly, plaintiff may not seek damages for dignitary harm at trial.

C. Nominal Damages

Finally, plaintiff contends **[*11]** she is entitled to seek nominal damages for defendant's alleged violations of the RA and ACA.

The Court agrees.

In a contract action, if a plaintiff cannot show actual damages flowing from the breach of contract, she is entitled to nominal damages. *Restatement (Second) of Contracts § 346(2)* ("If the breach caused no loss or if the amount of the loss is not proved . . . , a small sum fixed without regard to the amount of loss will be awarded as nominal damages."); 24 Williston on Contracts, supra, § 64.9; see, e.g., *Manhattan Sav. Inst. v. Gottfried Baking Co., 286 N.Y. 398, 400, 36 N.E.2d 637 (1941)* (per curiam) (plaintiff awarded nominal damages of six cents).

A plaintiff who seeks nominal damages to redress an injury has standing to pursue her claim in federal court; that is, her claim is not moot. *Uzuegbunam v. Preczewski, 141 S. Ct. at 801-02*.

Moreover, a plaintiff may seek nominal damages at trial even if she did not explicitly request nominal damages in her complaint. See *Irish Lesbian & Gay Org. v. Giuliani, 143 F.3d 638, 651 (2d Cir. 1998)*; see also *Fed. R. Civ. P. 54(c)* (final judgments shall "grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings").

Here, plaintiff is entitled to seek nominal damages on her RA and ACA claims at trial.

First, nominal damages are a generally accepted remedy in contract actions, 24 Williston on Contracts, supra, § 64.9, and the Supreme Court in *Cummings* held **[*12]** that generally accepted contract remedies were appropriate to redress violations of the RA and ACA. *142 S. Ct. at 1578*.

Second, plaintiff's claims are not moot in light of her request for nominal damages. *Uzuegbunam v. Preczewski, 141 S. Ct. at 802*.

Third, plaintiff's decision not to request nominal damages in her complaint is not dispositive. Because plaintiff requested compensatory damages in her complaint, she may seek nominal damages at trial. See *Irish Lesbian & Gay Org. v. Giuliani, 143 F.3d at 651*.

Accordingly, plaintiff's claims are not moot, and she is permitted to seek nominal damages at trial.

## CONCLUSION

The Court has subject-matter jurisdiction over this dispute, and the case shall proceed to trial.

The Court will conduct a case management conference on **July 15, 2022, at 2:30 p.m.**, at which time the parties shall be prepared to discuss, among other things, whether the parties consent to a bench trial, the setting of a trial date, and a schedule for pretrial submissions; as well as what good faith efforts they have made and will make to settle this case. The conference will be held in person at the White Plains courthouse, courtroom 620.

Dated: June 16, 2022

White Plains, NY

SO ORDERED:

/s/ Vincent L. Briccetti

Vincent L. Briccetti

United States District Judge

---

# AUTHORITY 4

🅐 Neutral
As of: August 17, 2022 5:42 PM Z

## *Doe v. Purdue Univ.*

United States District Court for the Northern District of Indiana, Lafayette Division

July 20, 2022, Decided; July 20, 2022, Filed

CAUSE NO.: 4-18-CV-89-JEM

**Reporter**
2022 U.S. Dist. LEXIS 128601 *; 2022 WL 2828238

MARY DOE AND NANCY ROE, Plaintiffs, v. PURDUE UNIVERSITY, et al., Defendants.

**Prior History:** *Doe v. Purdue Univ., 2019 U.S. Dist. LEXIS 49926, 2019 WL 1369348 (N.D. Ind., Mar. 25, 2019)*

# Core Terms

damages, discipline, sexual history, investigations, assault, motion in limine, incapacitated, staff, allegations, incapacity, emotional, non-party, sexual, exclude evidence, prejudicial, retaliation, retaliatory, punitive

**Counsel: [\*1]** For Mary Doe, Nancy Roe, Plaintiffs: Jeffrey A Macey, Macey Swanson LLP, Indianapolis, IN.

For Purdue University, Alyssa Rollock, in their official and individual capacities, Katie Sermersheim, in their official and individual capacities, Defendants: Joseph H Harrison, III, William P Kealey, LEAD ATTORNEYS, Stuart & Branigin LLP - Laf/IN, Lafayette, IN.

**Judges:** MAGISTRATE JUDGE JOHN E. MARTIN.

**Opinion by:** JOHN E. MARTIN

# Opinion

## OPINION AND ORDER

This matter is before the Court on Plaintiffs' Motion in Limine [DE 87] and Defendants' Motion in Limine [DE 88], both filed June 6, 2022. Defendants filed their response to Plaintiffs' motion on June 21, 2022, Plaintiffs did not file a reply, and the time to do so has expired. Plaintiffs filed their response to Defendants' Motion on June 21, 2022, and Defendants filed their reply on June 28, 2022.

## I. Analysis

A motion in limine will be granted "only when evidence is clearly inadmissible on all potential grounds." *Hawthorne Partners v. AT & T Techs., Inc., 831 F. Supp. 1398, 1400 (N.D. Ill. 1993)*; *see also Dartey v. Ford Motor Co., 104 F. Supp. 2d 1017, 1020 (N.D. Ind. 2000)*. Most evidentiary rulings will be resolved at trial in context, and this "ruling is subject to change when the case unfolds." *Luce v. United States, 469 U.S. 38, 41-42, 105 S. Ct. 460, 83 L. Ed. 2d 443 (1984)*. The Court considers each request in turn.

Some requests for exclusion were either agreed or not objected to. On review of the requests, **[\*2]** the Court concludes that evidence, testimony, or argument on the following topics will be excluded:

A. Insurance, unless Defendants offer evidence or argument as to hardships to Defendants as a result of any judgment, or that a verdict will cost taxpayers money; and

B. Reference to the "Golden Rule," putting jurors in Plaintiffs' shoes, or similar arguments.

There were also some requests to which the other party objected, which the Court will address in turn.

### A. Plaintiffs' prior sexual history

Plaintiffs request that any testimony, evidence, or argument regarding their prior sexual history be excluded. Plaintiffs argue that any such history should be excluded under *Federal Rules of Evidence 402*, *403*, *404*, and *412(a)*. Defendants argue that Plaintiffs have not specifically identified what evidence of Plaintiffs' prior sexual history they want excluded; that Plaintiffs have put their sexual history at issue; their prior statements about their sexual history, or failure to disclose their sexual history are at the heart of this

dispute; and *Rule 412(a)* is not applicable because this is not a case about alleged sexual misconduct.

Although character evidence or evidence of prior acts is generally excluded, *see Fed. R. Evid. 404(b)*, Defendants argue that Plaintiffs' [*3] prior sexual history is admissible both because Plaintiffs have made it an issue, and because Plaintiffs' disclosure/nondisclosure of it is at the heart of this case. The Federal Rules of Evidence prohibit evidence of prior acts to establish character or actions in conformity with those behaviors. *Fed. R. Evid. 404(b)* and *412(a)*. Credibility may be addressed by evidence as to truthfulness or untruthfulness only after the character of the witness for truthfulness has been attacked by opinion or reputation or otherwise. *Fed. R. Evid. 608*. Accordingly, evidence of prior acts of the Plaintiffs will be excluded, except for those acts directly put at issue by the pleadings in this matter, including the fact that Plaintiff Roe was a victim of a previous sexual assault, Plaintiff Roe's two incidents of sexual activity at issue in this matter, the fact that Plaintiff Doe had previously had a consensual sexual relationship with the male student at issue in her incident, and that Plaintiff Doe did not disclose at the beginning of the inquiry but subsequently did disclose it. Otherwise, Plaintiffs' sexual histories are excluded "unless and until Defendant alerts the Court and opposing counsel outside the presence of the jury that it [*4] seeks to admit particular evidence under *Federal Rule of Evidence 404(b)*." *Cimaglia v. Union Pac. R. Co., 2009 U.S. Dist. LEXIS 14518, at *7, 2009 WL 499287, at *7 (C.D. Ill. Feb. 25, 2009)*.

## B. Evidence or argument regarding Purdue's False Statement Rule

Defendants move to exclude evidence or argument that asks the jury to determine anew whether Plaintiffs violated Purdue's False Statement Rule[1] or that they applied the False Statement Rule in retaliation. Plaintiffs argue that the issues in this case are whether Purdue was properly applying its False Statement Rule or whether the processes in these investigations were infected with discriminatory conduct, and therefore that

they should be permitted to put on evidence of Doe's and Roe's veracity.

Motions in limine are not proper tools to litigate contested issues of fact or law. *Mid-America Tablewares v. Mogi Trading Co., 100 F.3d 1353, 1363 (7th Cir. 1996)* ("While this might be a proper argument for summary judgment of for judgment as a matter of law, it is not a proper basis for a motion to exclude evidence prior to trial."). Plaintiffs claim that Purdue conducted shoddy investigations into their allegations, ignored relevant evidence, made improper outcome-determinative conclusions, failed to advise them that they were being investigated and subject to discipline, and then suspended them in retaliation for making claims that Purdue disbelieved on the basis [*5] of those flawed investigations. Whether Defendants made those decisions on the basis of gender or gender-related considerations is at the core of Plaintiffs' claims. Defendants will be permitted to introduce evidence and make arguments as to their compliance with both the Rule and Title IX's requirements to investigate and determine responsibility, as well as applicable Department of Education rules and regulations. Plaintiffs will be permitted to introduce evidence and make arguments as to Defendants' failure to apply the Rule to them, whether Defendants' conduct was protected by either Purdue's Rule or applicable Department of Education rules and regulations, and whether Defendants' conduct in its efforts to apply the Rule was discriminatory and/or violative of due process.

## C. Evidence or argument challenging the sufficiency of Purdue's response to Plaintiffs' allegations

Defendants move to exclude evidence or argument challenging the sufficiency of Purdue's response to Plaintiffs' allegations and argue that Plaintiffs should be precluded from trying to argue or show that Defendants violated the deliberate indifference standard for a response to a report of sexual harassment. Plaintiffs [*6] allege that Defendants acted with deliberate indifference to the assaults on Plaintiffs by disciplining Plaintiffs for reporting those assaults in a manner which discriminates against women who complain of sexual assault.

Defendants' requested limitation on evidence and argument goes to the contested issues of fact and law at issue in this case; it is not granted. *See Mid-America Tablewares, 100 F.3d at 1363*.

## D. Evidence or argument that invites a propensity inference between the respective interactions Purdue

---

[1] Purdue's False Statement Rule provides: This policy may not be used to bring knowingly false or malicious charges against any faculty, staff, students or recognized student organizations, including fraternities, sororities and/or cooperatives. Disciplinary action will be taken against any person or group found to have brought a charge of Harassment in bad faith or any person who, in bad faith, is found to have encouraged another person or group to bring such a charge.

had with each Plaintiff and concerning Purdue University discipline of any non-party or of any non-party's Title IX allegations or lawsuits

Defendants argue that _Rules 403_ and _404_ preclude evidence or argument inviting a propensity inference between Purdue's interactions with each Plaintiff on the basis that the Plaintiffs have admitted the underlying assaults are unrelated, and therefore attempting to draw inferences on the basis of the other assault would be unduly prejudicial. _Waite v. Wood Cty., No. 16-cv-646-wmc, 2017 U.S. Dist. LEXIS 224615 *1 (W.D. Wis. Dec. 20, 2017)_. Despite their earlier requests being denied, Defendants again argue that bifurcation would be appropriate.[2] Defendants also move to exclude evidence or argument about discipline imposed on non-parties, particularly the two males involved in the incidents **[*7]** at issue, and further move to exclude evidence or arguments as to the existence of, allegations or evidence of, rulings in, or resolution of, other Title IX claims or lawsuits it is involved in, as irrelevant, confusing for the jury and prejudicial to the Defendants.

Plaintiffs argue that evidence of treatment toward other members of a protected group is "circumstantial evidence of intentional discrimination." _Troupe v May Dep't Stores Co., 20 F.3d 734, 736 (7th Cir. 1994)_. Plaintiffs argue that evidence of discipline imposed on non-party females would be circumstantial evidence of intentional discrimination against women and disparate treatment of Plaintiffs, and that the discipline of the two non-party males involved in the incidents at issue goes to the heart of their case, is being offered to establish intent or motive and should not be excluded.

Because the issue of whether male students were treated differently than female students is a central tenet of Plaintiffs' claims, evidence or arguments that male students were disciplined, and the nature and extent of that discipline, will not be precluded. _See Mid-America Tablewares, 100 F.3d at 1363_. Whether other female students were treated similarly to Plaintiffs is also related to Plaintiffs' discrimination claims. "'[B]ehavior toward **[*8]** or comments directed at other [members] in the protected group' is one type of circumstantial evidence that can support an inference of discrimination." _Hasan v. Foley & Lardner LLP, 552 F.3d 520, 529 (7th Cir. 2008)_ (quoting _Hemsworth v. Quotesmith.Com, Inc., 476 F.3d 487, 491 (7th_

_Cir.2007)_); _see also Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 388, 128 S. Ct. 1140, 170 L. Ed. 2d 1 (2008)_ (explaining that evidence of discrimination experienced by other witnesses may be relevant based on the facts and circumstances of a particular case). In this case, other female students reporting assaults are members of the protected group. As such, evidence of behavior and comments directed at them during Purdue's Title IX investigations into their claims is relevant to whether Defendants engaged in prohibited discrimination.

As a blanket request, precluding any evidence or argument on these issues would be overbroad. Evidence may be adduced as to the commonality of decision-makers, decisions, processes, the non-existence of separate investigations into Plaintiffs' conduct, and the timing of the incidents/investigations. Evidence or arguments about other Title IX allegations, claims and evidence of Title IX violations may also be presented, so long as any relevant privacy restrictions are maintained. Evidence of the existence of other lawsuits that have not resulted in judgments would be prejudicial and is excluded. **[*9]** Evidence of any consensual resolution of other lawsuits is also precluded.

E. Evidence or argument concerning an alleged policy of retaliatory discipline

Defendants request that evidence or argument of a policy of retaliatory discipline should be precluded because Plaintiffs have not shown how many other students were subject to this purported policy. Plaintiffs argue that Defendants have misunderstand the legal meaning of policy in the _Section 1983_ context, i.e., government policy made through "those whose edicts or acts may fairly be said to represent official policy." _Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)_.

The existence of the purported policy is a core issue for the jury to decide. Motions in limine are not proper tools to litigate contested issues of fact or law. _Mid-America Tablewares, 100 F.3d at 1363_. Either party may raise objections to specific exhibits, testimony, or argument during trial, and in context, those objections will be ruled upon, but as a blanket prohibition the request will be denied.

F. Evidence or argument regarding Purdue CARE staff

Defendants request that evidence or argument regarding whether Purdue's CARE staff, non-party

---

[2] Defendants have brought two motions to bifurcate the Plaintiffs' claims; both have been denied. [DE 26, 83].

mental health providers, credited Plaintiffs' accounts or assault or other abuse should be excluded since it would be prejudicial **[*10]** to Defendants, confuse the jury, and waive the privilege of confidentiality which exists between CARE staff and Plaintiffs. Plaintiffs argue that the privilege is theirs to waive, and that CARE staff's observations of Plaintiffs' emotional states, conduct during the investigation, and the process of Purdue's investigatory process is unrelated to staff members' assessment of Plaintiffs' credibility and should be admissible.

Evidence or argument as to whether Purdue's CARE staff believed the Plaintiffs will be precluded, but evidence or argument of CARE staff members' observations of Plaintiffs' emotional state or conduct during the investigation and their personal knowledge of evidence submitted by Plaintiffs to Purdue will not be precluded.

## G. Evidence or argument regarding emotional distress or harm

Defendants move to preclude evidence or argument regarding Plaintiffs' emotional distress or harm, arguing that the United State Supreme Court's recent ruling in *Cummings v. Premier Rehab Keller, P.L.L.C., 596 U.S.    , 142 S. Ct. 1562, 212 L. Ed. 2d 552 (April 28, 2022)*, precludes recovery of emotional distress damages under Title IX. Plaintiffs argue that *Cummings* applies only to *Rehabilitation Act* and Patient Protection and Affordable Care Act claims. *Cummings, 142 S. Ct. at 1576*. Because *Cummings* was not a Title IX action, it does not **[*11]** make evidence of emotional distress or harm inadmissible in this case. *Id.* Therefore, evidence of such damages will not be precluded.

## H. Evidence or argument regarding consequential damages

Defendants also move to preclude evidence of consequential damages, asserting as bases for exclusion that Plaintiffs failed to comply with *Rule 26(a)(1)(A)(iii)* and provide a "computation of each category of damages claim by the disclosing party;" that any claim for tuition, room, or board are state law contract claims and must be brought in state court because *Cummings* limits their damages to those claims; and since Plaintiffs could have returned after the suspensions expired, their claims for costs of other education are immaterial.

As discussed below, to the extent any party has failed to disclose any substantive evidence, the Court notes that such evidence will be inadmissible, except for permissible impeachment or rebuttal purposes. *Fed. R. Civ. P. 37(c)(1)*.

As noted above, since *Cummings* does not hold that it limits Title IX damages, it does not justify precluding evidence of Plaintiffs' consequential damages. *Cummings, 142 S. Ct. at 1576*.

Finally, the issue of whether Plaintiffs suffered any damages and/or failed to mitigate any damages is an ultimate issue for the jury to decide, **[*12]** and not appropriate for a motion to exclude. *See Mid-America Tablewares, 100 F.3d at 1363*.

## I. Evidence or argument regarding punitive damages, sending a message to Defendant or punishing the Defendants

Defendants also move to preclude evidence or argument regarding punitive damages, relying again on the recent *Cummings* decision. Defendants contend that the *Section 1983* punitive damage claims should be bifurcated for trial if the jury decides individual Defendants are liable to either Plaintiff to avoid jury confusion. Defendants also argue that phrases such as "send defendants a message" are prejudicial and irrelevant. *Lauderdale v. Russell, No. 1:16-cv-02684-TWP-TAB, 2020 U.S. Dist. LEXIS 2670, *9 (S.D. Ind. Jan. 8, 2020)*.

As noted, *Cummings* does not apply to this case. Additionally, Defendants' prior efforts to bifurcate this case have all been denied, and they have provided no new arguments in favor of reconsidering those decisions. Evidence or arguments relative to punitive damages will not be excluded. Because punitive damages are available if Plaintiffs meet their burden of demonstrating that they are entitled to them, evidence or arguments about punishing defendants or sending them a message are not improper.

## J. Evidence or testimony regarding any diagnosis or other clinical determination

Defendants move to exclude Plaintiffs' or lay witness evidence **[*13]** or testimony as to whether Plaintiff Roe was "clinically incapacitated by alcohol" at the time of the incident at issue on the basis that Roe is not qualified to make that determination and has not disclosed any "expert diagnostic opinion establishing her incapacity as a matter of medical science." Plaintiffs point out that Purdue relied on no medical or expert testimony about Roe's incapacity before it issued its